UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
CHRISTINE JEAN SEPULVEDA,

                 Plaintiff,

                                            **MEMORANDUM AND ORDER**

   - against -                            19-CV-1123 (RRM)

ANDREW M. SAUL,
Commissioner of Social Security,

                 Defendant.
------------------------------------------------------------------x
ROSLYNN R.  MAUSKOPF, United States District Judge.

      Christine Jean Sepulveda brings this action against Andrew M. Saul, Commissioner of

Social Security ("Commissioner"), seeking review of the Commissioner's determination that she

was not disabled and, therefore, not eligible for Supplemental Security Income ("SSI") for the

period of September 23, 2011, through December 20, 2013.  Sepulveda and the Commissioner

now cross-move for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).  (Pl.'s Mem.

(Doc. No. 13); Def.'s Mot. (Doc. No. 14).)  For the reasons set forth below, the Commissioner's

motion is denied, and Sepulveda's motion is granted to the extent that it seeks remand.

## BACKGROUND

      Sepulveda was born in 1964 and was 49 years old at the end of 2013.  Tr. 382.[1]  She has

completed a high school education.  Tr. 170.  She reported past work as a Bank Manager from

October 1984 until August 2011.  Tr. 170.

---

[1] Citations preceded by "Tr." refer to the Administrative Record (Doc. No. 19) and use original pagination.  All other page numbers refer to ECF pagination.

## I.      Medical Evidence

On April 13, 2011, CT scans of Sepulveda's chest showed no evidence of pulmonary nodules.  Tr. 271.  An April 19, 2011 CT scan of the lungs showed no evidence of pulmonary nodules and minimal coronary artery nodules.  Tr. 270.

Sepulveda saw her primary care physician, Doctor of Osteopathic medicine ("D.O.") Dr. Betty Parisis, on November 2, 2011.  Tr. 266.  Dr. Parisis's examination revealed that Sepulveda was obese and had gastroesophageal reflux disease ("GERD"), as well as diabetes, extremity pain, depressed mood, anxiety, and paresthesia (a 'pins and needles' sensation).  Tr. 266.  Dr. Parisis noted that Sepulveda should take the following medications: Lantus, an injectable insulin; Victoza, an injectable non-insulin diabetes medication; lisinopril, a high blood pressure medication; Lexapro, an antidepressant; Prevacid, a treatment for GERD; Naproxen, a nonsteroidal anti-inflammatory drug ("NSAID"); Advil or Tylenol; Claritin D, an allergy medicine; fish oil; B12 supplements; iron supplements; calcium and Vitamin D supplements; glucosamine and chondroitin supplements for arthritis; and a multivitamin.  Tr. 267.

That same day, Sepulveda saw Dr. Rajeev Vohra, a bariatric surgeon to whom she was referred by Dr. Parisis, for lap band adjustment following a July 2010, lap band surgery; Sepulveda also saw Dr. Vohra a week later on November 9, 2011.  Tr. 195–200.  For both visits, physical examination of Sepulveda was unremarkable.  Tr. 196, 198.  Dr. Vohra's review of Sepulveda's symptoms noted obesity, diabetes, heartburn, parathesia, and extremity pain and he diagnosed a history of breast cancer, obesity, and paresthesia of the lower extremities.  Tr. 196–99.  On November 9, 2011, Sepulveda underwent blood glucose testing, which showed that her blood sugar was in range.  Tr. 201.  Her creatinine, cholesterol, Vitamin D, and hemoglobin were all out of range.  Tr. 201–207.

On January 12, 2012, Dr. Parisis prescribed Sepulveda Cymbalta to treat her diabetic peripheral neuropathy.  Tr. 262.  On February 15, 2012, Dr. Parisis noted that Sepulveda needed to lose weight and that she did not tolerate Cymbalta.  Tr. 253.

On March 28, 2012, Sepulveda saw Dr. Ellen Braunstein, a neurologist, who was also referred by Dr. Parisis.  Tr. 320–21, *repeated at* 336–37.  Sepulveda reported that she was taking the following medications: Lantus, an injectable insulin; Victoza, an injectable non-insulin diabetes medication; lisinopril, a high blood pressure medication; Crestor, a cholesterol medication; Lexapro, an SSRI; Prevacid, a treatment for GERD; Naprosyn, a nonsteroidal anti-inflammatory drug ("NSAID"); and a multivitamin.  Tr. 320.  She had also recently started taking Metanx, a Vitamin B supplement used for peripheral neuropathy, which she thought had improved her tingling and numbness in her hands.  Tr. 320.  Dr. Braunstein noted that Sepulveda had a history of neck pain, carpal tunnel syndrome, peripheral neuropathy, diabetes, and lumbar radiculopathy.  Tr. 320–21.

On physical examination, Sepulveda appeared comfortable and a mental status examination showed that she was awake, alert, and fully oriented.  Tr. 320.  Her memory testing performance was adequate and she could read, write, and copy without difficulty.  Tr. 320.  On cranial nerve testing, Dr. Braunstein could not visualize Sepulveda's optic discs, but found her extra ocular movements were intact, and her pupils were equal and reactive to light.  Tr. 320.  Dr. Braunstein also observed brisk corneal reflexes bilaterally, a symmetrical face, and a bilateral upgoing palate and midline tongue.  Tr. 320.  Sepulveda had some movement restrictions in her neck, decreased sensation in her third and fourth fingers on both hands, and decreased sensation her lower legs.  Tr. 320–21.  Dr. Braunstein noted that otherwise she is "diffusely 5/5," as in full strength, with normal bulk and tone.  Tr. 320–21.  Sepulveda's reflexes were noted as "trace,

3

toes downgoing," and her coordination was consistent with her strength.  Tr. 321.  Her gait and balance were normal, though she had some difficulty with heel-to-toe walking.  Tr. 321.  Dr. Braunstein indicated that based on Sepulveda's history and exam, it appeared that she did have an underlying peripheral neuropathy.  Tr. 321.  She also had symptoms consistent with lumbar radiculopathy, she was an insulin dependent diabetic, and she had a history of breast cancer.  Tr. 321.  Dr. Braunstein recommended that Sepulveda undergo a cervical MRI, nerve conduction testing to assess peripheral nerve function, and electromyographies ("EMGs") of upper and lower extremities to assess neuromuscular function.  Tr. 321.  Dr. Braunstein informed Dr. Parisis of this assessment and these tests.  Tr. 321.

A March 28, 2012 electrodiagnostic study, performed by Dr. Braunstein, was abnormal.  Tr. 213, *repeated at* 311, 327.  Nerve conduction studies done on April 2 and 3, 2012, showed diffuse sensory motor neuropathy and abnormal results consistent with bilateral carpal tunnel syndrome.  Tr. 210–12, *repeated at* Tr. 318–19, 326–27, 334–35.

Sepulveda saw Dr. Parisis on May 1, 2012, and reported hand numbness.  Tr. 251.  She was also diagnosed with neck and back pain, paresthesia, obesity, high blood pressure, high cholesterol, anxiety, and insomnia.  Tr. 251.  Physical examination indicated obesity and edema.  Tr. 250.  Dr. Parisis counseled Sepulvada regarding diet and exercise and again urged her to lose weight.  Tr. 250.

Sepulveda returned to Dr. Braunstein on May 4, 2012, and her physical examination was essentially unchanged from her prior visit.  Tr. 208.  The nerve conduction studies Dr. Braunstein had performed revealed carpal tunnel syndrome.  Tr. 208.  Upon a "mini-mental status exam," Dr. Braunstein found Sepulveda to by awake, alert, and fully oriented.  Tr. 208.  She was able to repeat three unrelated words and recall them in five minutes, spell forwards and

4

backwards, repeat phrases, and read without difficulty. Tr. 208. Dr. Braunstein stated that Sepulveda should continue on her current treatment regimen and should consider seeing an orthopedist for her carpal tunnel syndrome. Tr. 209.

A sonogram taken on May 11, 2012, showed a single, subcentimeter nodule in each lobe of the thyroid gland. Tr. 215, *repeated at* Tr. 272. Sepulveda saw an ophthalmologist, Dr. Todd J. Bragin, a few days later on May 14, 2012, for a diabetic eye examination. Tr. 216. Dr. Bragin observed no macular edema or diabetic retinopathy and recommended monitoring of Sepulveda's health and a yearly follow-up. Tr. 216.

On June 13, 2012, Sepulveda saw Angeliki S. Valsamis, D.O., an endocrinologist, who assessed diabetes, high cholesterol, and obstructive sleep apnea with obesity. Tr. 217–18. Sepulveda was taking the following medications: Lantus, an injectable insulin; Victoza, an injectable non-insulin diabetes medication; lisinopril, a high blood pressure medication; Crestor, a cholesterol medication; Prozac, an SSRI; Prevacid, a treatment for GERD; glucosamine and chondroitin supplements for arthritis; fish oil; calcium supplements; and a multivitamin. Tr. 217. Dr. Valsamis encouraged Sepulveda to continue her medication regimen and advised Sepulveda to meet with the nutritionist and increase her activity level. Tr. 218. Dr. Valsamis also noted that Sepulveda's blood pressure was at goal and sent Sepulveda for lab tests to check her metabolic profile. Tr. 218.

On June 16, 2012, Dr. Paresis noted that Sepulveda wanted to discontinue Prozac because of heart palpitations. Tr. 249.

Sepulveda saw Dr. Paresis again on September 5, 2012. Tr. 247. She complained of low energy, problems losing weight, and said that for the past three months she had had worsening low back pain when trying to rise from a seated position. Tr. 247. She was seeing a therapist for

5

depression and anxiety.  Tr. 247.  Dr. Parisis assessed morbid obesity and low back pain.  Tr. 246.  Laboratory work from September 5, 2012, showed low ANA antibody levels, which could be associated with lupus, rheumatoid arthritis, old age, drugs, or a chronic infection.  Tr. 220.  Sepulveda's rheumatoid factor and hemoglobin results were also abnormal.  Tr. 220, 224.  A September 19, 2012, x-ray of the base of the spine showed no evidence of skeletal abnormality and slight degenerative changes of the lower lumbar spine.  Tr. 226.  Sepulveda returned to Dr. Parisis on September 29, 2012, and was assessed for diabetes, hypertension, high cholesterol, diabetic peripheral neuropathy, morbid obesity, and low back pain.  Tr. 243.

Sepulveda saw rheumatologist Esther Lipstein, M.D., on December 6, 2012, on referral from Dr. Parisis, for pain in the coccyx area.  Tr. 227–29, *repeated at* Tr. 273–75.  Sepulveda reported problems getting up and out of a chair since July 2012.  Tr. 227.  She also reported wearing a splint periodically for her hands.  Tr. 229.  The physical examination showed positive Phalen's test and positive Tinel's sign, indicating carpal tunnel syndrome, which Dr. Lipstein described as "quite symptomatic."  Tr. 228–29.  Dr. Lipstein prescribed the NSAID Meloxicam for pain and injected 20mg of Kenalog, a corticosteroid, for Sepulveda's carpal tunnel.  Tr. 228.  Sepulveda had several areas of tenderness in the upper body, but did not have enough trigger points for a diagnosis of fibromyalgia.  Tr. 228.  She was advised not to sit on hard surfaces as her pain in her coccyx could be related to bursitis in this area.  Tr. 229.

On December 12, 2012, Dr. Parisis noted that Sepulveda's intermittent low back pain had improved with Medrol, a steroid, but that her symptoms had returned, so she was also taking Meloxicam.  Tr. 240.  Dr. Parisis's assessment was essentially the same from the prior visit, with the additional of probable rheumatoid arthritis, due to a positive rheumatoid factor in recent lab work.  Tr. 239.

Dr. Parisis completed a medical questionnaire on December 13, 2012.  Tr. 230–34, *repeated at* Tr. 282–86.  She diagnosed Sepulveda with diabetes, hypertension, high cholesterol, bilateral peripheral neuropathy, history of breast cancer, morbid obesity, obstructive sleep apnea, carpal tunnel syndrome, and rheumatoid arthritis.  Tr. 230.  Her symptoms included paresthesia, muscle pain, joint pain, and neck pain.  Tr. 230.  Dr. Parisis opined that Sepulveda's pain would frequently interfere with her attention and concentration and that she was incapable of performing even low stress jobs.  Tr. 231.  Sepulveda could sit and stand only ten minutes at one time and could sit, stand, or walk for a total of less than two hours.  Tr. 231–32.  She had to walk around every ten minutes for a period of five minutes during the workday and she required a job that allowed her to change positions.  Tr. 232.  The doctor stated that Sepulveda would have to take unscheduled breaks and had to elevate her legs with prolonged sitting.  Tr. 232.  Sepulveda could occasionally lift and carry ten pounds.  Tr. 232.  She could only rarely perform postural activities and could grasp, turn, and twist objects; engage in fine manipulation; and reach for 5% of the day.  Tr. 233.  The doctor stated that Sepulveda would be absent from work more than four days per month.  Tr. 233.

In January 7, 2013, Sepulveda returned to Dr. Bragin for an eye examination, and her condition was unchanged.  Tr. 276.  The following day, on January 8, 2013, Sepulveda saw Dr. Parisis, and the physical examination was largely unchanged from prior visits.  Tr. 236–37.  Laboratory blood testing from January 12, 2013, indicated abnormal blood sugar levels.  Tr. 344.  On February 15, 2013, Sepulveda underwent a cardiac stress test, which was normal.  Tr. 277–78, *see* Tr. 279–80.

Dr. Parisis saw Sepulveda again on June 8, 2013, and assessed morbid obesity, diabetes, high cholesterol, hypertension, and sinusitis.  Tr. 295.  These findings were essentially the same

at Sepulveda's follow-up visit on June 14, 2013.  Tr. 292–93.  Lab tests from June 14, 2013,

showed abnormal Vitamin B12 values.  Tr. 297–90.

Sepulveda underwent an MRI scan of the lumbar spine on October 1, 2013.  Tr. 339–40.

The MRI revealed two disc herniations, another bulging disc, and widening of the neural

foramen in the lumbar spine; one herniated disc in the thoracic spine; and an ovarian cyst on the

right ovary.  Tr. 340.

A nerve conduction study done on October 4, 2013, indicated S1 bilateral radiculopathy,

which is a pinched or damaged sacral nerve.  Tr. 316–17, *repeated at* Tr. 332–33.  Diagnostic

testing from October 15, 2013, revealed findings consistent with bilateral carpal tunnel

syndrome.  Tr. 314–15, *repeated at* Tr. 330–31.

Sepulveda saw Dr. Braunstein on September 30, 2013, complaining of increased pain in

her hands and feet.  Tr. 308–09, *repeated at* Tr. 324–25.  She had pain in her upper thigh and left

knee when she walked and she complained of lower back pain.  Tr. 308.  Upon physical

examination, she demonstrated some depressed ankle and wrist jerks and decreased sensation in

her toes, but otherwise had full strength and normal muscle bulk and tone.  Tr. 308.  Dr.

Braunstein found Sepulveda to be awake, alert, and fully oriented.  Tr. 308.  She could repeat

three unrelated words and recall them in five minutes, spell forwards and backwards, repeat

phrases, and read without difficulty.  Tr. 308.  Dr. Braunstein stated that Sepulveda had

underlying peripheral neuropathy and signs of both lumbar and cervical radiculopathy.  Tr. 308.

The doctor recommended EMGs of the upper and lower extremities, nerve testing, and a lumbar

MRI.  Tr. 309.

On October 25, 2013, Sepulveda returned to Dr. Braunstein, complaining of generalized

aches and pains throughout her body.  Tr. 306–07, *repeated at* tr. 322–23.  On physical

examination, Sepulveda had pain and limitation throughout, with depressed ankle and wrist jerks, and decreased sensation in her toes.  Tr. 306.  Her gait was normal.  Tr. 306.  Upon "mini-mental status exam," Dr. Braunstein found Sepulveda to be awake, alert, and fully oriented.  Tr. 306.  She could repeat three unrelated words and recall them in five minutes, spell forwards and backwards, repeat phrases, and read without difficulty.  Tr. 306.  Dr. Braunstein stated that Sepulveda had "multiple etiologies," and started her on Gabapentin, a nerve pain medication, and a conservative course of physical therapy.  Tr. 307.

Dr. Braunstein saw Sepulveda again on December 6, 2013.  Tr. 345–46.  Sepulveda reported that she was doing well on Topomax, another nerve pain medication, and that it was helping her neuropathy and pain; Dr. Braunstein increased the dosage.  Tr. 345.  The physical examination was unremarkable and Dr. Braunstein stated that Sepulveda had "minimal pain limitations throughout."  Tr. 345.  Sepulveda was awake, alert, and fully oriented.  Tr. 345.  She could repeat three unrelated words and recall them in five minutes, spell forwards and backwards, repeat phrases, and read without difficulty.  Tr. 345.

## II.    Procedural History

Sepulveda applied for disability insurance benefits on October 16, 2012, alleging that she became disabled on September 23, 2011.  Tr. 143–49.  After her initial application was denied, Sepulveda requested a hearing before an administrative law judge (ALJ).  Tr. 101–02.  On November 18, 2013, Sepulveda, accompanied by her attorney, attended a hearing before ALJ April Wexler.  Tr. 54–81.  The ALJ issued a decision on December 20, 2013, finding that Sepulveda was not disabled.  Tr. 39–53.  The ALJ's decision became the final decision of the Commissioner when, on March 10, 2015, the Appeals Council denied Sepulveda's request for review of the ALJ's decision.  Tr. 1–6.

On May 12, 2015, Sepulveda filed a complaint in this district, challenging the Commissioner's decision. Tr. 416–18. Judge Feuerstein granted Sepulveda's cross-motion for judgment on the pleadings, on the grounds that the ALJ improperly substituted her lay opinion when she found that Sepulveda had an RFC of sedentary work but failed to cite to any medical opinion evidence that supported her conclusion, and remanded the action to the Commissioner for further proceedings. Tr. 419–44.

Sepulveda filed a subsequent claim for Title II disability on March 27, 2015, and was found disabled as of December 21, 2013. *See* Tr. 362, 448. Accordingly, the relevant period in the instant case is limited to September 23, 2011, through December 20, 2013. *See* Tr. 362, 448.

### III.    Second Administrative Hearing

On April 25, 2018, Sepulveda, again accompanied by her attorney, attended a second hearing before ALJ Wexler. Tr. 378–409. Sepulveda testified at that hearing that she lived her with father and her young daughter, who was between 5 and 8 years old during the relevant period. Tr. 383. Sepulveda had a driver's license and drove. Tr. 384. She had completed high school and in addition to her past work as a bank manager she had also held the position of assistant manager for in-store branches. Tr. 383–84. Sepulveda testified that she had stopped working in September 2011 due to her diabetes, herniated discs, carpal tunnel syndrome, and neuropathy. Tr. 385. She testified, "[Y]our concentration when you're in pain, you couldn't perform the job the way you needed to. It was very stressful." Tr. 385. She explained that she would get tingling in her arms, hands, and legs, and burning sensations and shooting pains in her legs. Tr. 385. As a result, sitting became difficult and her concentration was impaired due to the pain, which "just was physically too much. It became a very stressful situation." Tr. 397.

Sepulveda stated that she took Metaformin for her diabetes and was insulin dependent but had not been hospitalized for diabetes during the period at issue.  Tr. 385, 387.  She testified that she attended physical therapy for her lower back issues but had no surgery or injections.  Tr. 387–88.  She was prescribed Naproxen for her pain, but discontinued use out of concern for her kidneys.  Tr. 388.  She also tried Gabapentin, which "knocked her out," but Topamax helped with her pain and she testified that she continued to take it.  Tr. 388.  With regard to her carpal tunnel syndrome, Sepulveda testified that she wore braces at night during the relevant period and had EMG testing done.  Tr. 389.  Sepulveda had carpal tunnel release surgery on her left hand approximately two years after the relevant period.  Tr. 389.

Sepulveda did not use any assistive device for walking and testified that she could take brief walks.  Tr. 392–93.  On a typical day, she would prepare breakfast for her daughter and get her off to school.  Tr. 390–91.  Sepulveda testified that she could do laundry – "maybe a small load here and there" – and load and unload the dishwasher, would help with "light meals type of thing at the most," and could drive locally to do errands or attend doctor appointments.  Tr. 390–91.  She said she did some local food shopping sometimes, but sometimes her sister would drop off groceries or she would order groceries to be delivered.  Tr. 391–92.  Sepulveda said she could shop for her daughter in local stores, socialize with friends and family, occasionally go out for meals, and use a computer for social media "here and there" and games.  Tr. 392–93.  Sepulveda clarified that she did not socialize much because there were not many people she knew in Oceanside aside from her family and she did not take any trips.  Tr. 393.

Vocational expert ("VE") Dawn Blythe also testified at the hearing.  Tr. 406–09.  The VE testified that Sepulveda had past work as a financial institutional manager.  Tr. 406.  The ALJ asked the VE to consider an individual of Sepulveda's age, education, and vocational

background, who was limited to sedentary work and who could occasionally lift ten pounds, sit for approximately six hours, and stand or walk for approximately two hours in an eight-hour day with normal breaks; could occasionally climb ramps of stairs, never climb ladders, ropes, or scaffolds; could occasionally balance, stoop, kneel, crouch, or crawl; and had unlimited push and pull and was limited to occasional fine fingering bilaterally. Tr. 406–07. The VE stated that such an individual could perform Sepulveda's past work. Tr. 407. The ALJ then asked the VE to consider the same hypothetical but with the additional limitations that she can sit for less than two hours; has the ability to sit ten minutes at a time; can stand and walk for less than two hours per day with the need to walk for five minutes every ten minutes; would require unscheduled breaks throughout the day; would need to elevate her legs throughout the day; could occasionally carry up to ten pounds; could rarely twist, scoop, crouch, squat, climb ladders or stairs; can use her hands, fingers, and arms five percent of the workday; and would be absent more than four times per month. Tr. 407–08. The VE stated that such an individual could not perform Sepulveda's past work or any other jobs in the national economy. Tr. 408.

Dr. Kyra Khan, a medical expert, also testified at the hearing. Tr. 398–405. Dr. Khan testified that based on the medical records, Sepulveda seemed to demonstrate some sensory motor neuropathy and that the exam completed by Dr. Parisis stated that Sepulveda could not stand or sit for more than ten minutes consecutively and could only seem to work for less than two hours at a time and lift less than ten pounds. Tr. 399. The ALJ instructed Dr. Khan that she was interested in objective findings and Dr. Khan's opinion, not Dr. Parisis's opinion. Tr. 399–400. Dr. Khan stated that it was her first hearing. Tr. 400. The ALJ then asked Dr. Khan if any of Sepulveda's impairments, either separately or together, meet or equal any impairments described in the listing of impairments. Tr. 400. Dr. Khan testified, "[y]es, I feel that she meets

11.14(A)," and explained the basis for this finding, relying again on Dr. Parisis's opinion.  Tr. 400–03.  However, Dr. Khan also testified that in her opinion, "there is nothing in the documentation that supports that her EMG and MRI findings at that time correlate with her level of symptomology."  Tr. 403–04.  Dr. Khan then said, "I'm sorry. I think I misunderstood…. I don't think that I can support that extreme limitation, part of it just because she doesn't demonstrate that on my review of the records."  Tr. 405.

## IV.    ALJ Decision

The ALJ issued a decision on December 20, 2013, finding that Sepulveda was not disabled.  Tr. 39–49.  The ALJ followed the familiar five-step process for making disability determinations, which the Second Circuit has described as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the Commissioner will consider him [*per se*] disabled .... Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quoting *DeChirico v. Callahan*, 134 F.3d 1177, 1179–80 (2d Cir. 1998)).

At step one of the sequential analysis, the ALJ found Sepulveda had not engaged in substantial gainful activity since September 23, 2011, the alleged onset date.  Tr. 44.  At step two, the ALJ determined that Sepulveda suffered from the following severe impairments:

diabetes mellitus, carpal tunnel syndrome, neuropathy, obesity, and a lumbar impairment.  Tr. 44.  The ALJ found that these impairments "cause more than minimal limitation in the context of the claimant's overall functioning."  Tr. 44.  At step three, the ALJ found that Sepulveda did not have an impairment or combination of impairments that met or medically equaled the criteria of a listed impairment.  Tr. 44–45.  Specifically, the ALJ found that Sepulveda's impairments did not meet the enumerated requirements of Listing 9.08, Diabetes, because the record "fails to establish neuropathy demonstrated by sign and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross or dexterous movements nor is there acidosis occurring on the average of once every 2 months."  Tr. 44.  Further, the ALJ found that Sepulveda's impairments did not meet the requirements for Listing 1.04, Disorders of the Spine, because the record does not demonstrate nerve root compression "characterized by neuro-anatomic distribution of pain, limitation of motion, motor loss accompanied by sensory or reflex loss or positive straight leg raising."  Tr. 45.

At step four, the ALJ assessed Sepulveda's symptoms and determined her residual function capacity ("RFC").  Tr. 45–47.  The ALJ found that Sepulveda had the RFC to perform sedentary work, except that she was limited to only occasional fine fingering bilaterally.  Tr. 45.  The ALJ based this finding in part on Sepulveda's testimony that even though carpal tunnel surgery had been recommended, she had not "gotten around to it," and that she had a 17-month treatment gap with Dr. Braunstein because "things were status quo."  Tr. 45.  The ALJ accorded "little weight" to the opinion of treating physician Dr. Parisis because "the majority of care has been centered over the claimant's diabetes and not her orthopedic/neurological complaints."  Tr. 46.  Further, the ALJ noted that Sepulveda did not testify to a need to elevate her legs, despite Dr. Parisis's opinion that Sepulveda would need to elevate her legs with sustained sitting, and

14

that Sepulveda's report of her daily activities such as cooking, doing laundry, and using the

computer were inconsistent with Dr. Parisis's assessment that Sepulveda was limited to only

using her hands for 5% of the day.  Tr. 46.  Additionally, the ALJ stated that the record indicated

that Sepulveda saw Dr. Braunstein for "routine care" and noted that the MRI of Sepulveda's

cervical spine, that Dr. Braunstein noted was consistent with "some degenerative changes," was

not part of the record.  Tr. 46.  The ALJ noted, "at no time does Dr. Braunstein furnish

restrictions preclusive of sedentary work nor can any such restrictions reasonably be discerned."

Tr. 47.  The ALJ found that Sepulveda's medically determinable impairments could reasonably

expected to cause the alleged symptoms, but that her statements about the intensity, persistence,

and limiting effects of these symptoms were not entirely credible.  Tr. 47.

Also at step four, the ALJ determined that Sepulveda was unable to perform any past

relevant work as a bank teller and assistant bank manager.  Tr. 47.  However, considering

Sepulveda's age, education, work experience, and RFC, the ALJ found, based on the VE

testimony, that there were jobs that exist in significant numbers in the national economy that

Sepulveda could perform, including Preparer, Carding Machine Operator, and Hand Mounter.

Tr. 48.

On March 10, 2015, the Appeals Council denied Sepulveda's request for review and the

ALJ's decision because the Commissioner's final decision.  Tr. 1–3.

## V.   The Instant Action

On February 25, 2019, Sepulveda commenced this action, seeking reversal of the

decision of the Commissioner of Social Security pursuant to Section 205(g) of the Social

Security Act, as amended, 42 U.S.C. § 405(g), 1383(c)(3).  Sepulveda and the Commissioner

15

now cross-move for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

In Sepulveda's Memorandum of Law, she argues that the ALJ failed to apply the treating physician rule in assessing the opinion of Sepulveda's primary care provider, Dr. Parisis, that Sepulveda could not work. (Pl.'s Mem. at 4–7.) Sepulveda argues that because the ALJ gave little weight to Dr. Parisis and did not state what weight she gave to the findings of Dr. Braunstein, the ALJ made an RFC determination "without the opinion of a medical expert" and with no support in the record. (*Id*. at 4.) Further, Sepulveda asserts that the ALJ "made no attempt to assess the requisite factors" to determine how much weight to give Dr. Parisis's opinion. (*Id*. at 6.) Finally, Sepulveda argues that the RFC determination is not supported by substantial evidence, both because the ALJ cherry-picked facts to support the RFC and because the ALJ failed to cite any evidence in the record to support her conclusion that Sepulveda's report of her symptoms was not entirely credible. (*Id*. at 7–9.) To further support these arguments, Sepulveda directs the Court to the briefs she filed before the Appeals Council in April of 2014, which contain more specific objections to ALJ Wexler's treatment of the record. (*Id*. at 5.)

In response, the Commissioner argues in his Memorandum of Law in Support of Defendant's Cross-Motion for Judgment on the Pleadings that the ALJ's RFC finding is supported by substantial evidence in the record, including both physical examinations and Sepulveda's statements about her limitations during the relevant period, and is based on an appropriate review of the record as a whole. (Def.'s Mem. (Doc. No. 15) at 11–12; 15–19.) Additionally, the Commissioner argues that the ALJ properly applied the treating physician rule in evaluating Dr. Parisis's opinion evidence, which was not well supported by the medical

evidence and was inconsistent with other substantial evidence in the record.  (*Id*. at 12–14.)

Further, the Commissioner objects to Sepulveda's argument that the ALJ failed to weigh Dr.

Braunstein's opinion, as Dr. Braunstein did not provide any opinion evidence.  (*Id*. at 15.)  The

Commissioner asserts that Sepulveda may not rely on the arguments made in the brief submitted

to the Appeals Council in 2014 because they challenge the ALJ's 2013 decision and not the

decision at issue here.  (*Id*. at 15.)

    In her Reply, Sepulveda argues that the testimony of Dr. Khan showed that she changed

her opinion after pressure from the ALJ, and that the ALJ made an RFC determination based on

solely her lay opinion after she gave little weight to Dr. Khan's testimony in addition to the little

weight afforded to Drs. Parisis and Braunstein.  (Pl.'s Reply (Doc. No. 16) at 2.)  Sepulveda also

argues that because Judge Feuerstein found that the ALJ substituted her lay opinion for the

opinion of a physician in the first hearing, and the ALJ again assigned little weight to the opinion

evidence in this proceeding, that the ALJ committed the same error and the case must be

remanded.  (*Id*. at 2–3.)

    In his Reply, the Commissioner objects to Sepulveda's characterization of Dr. Khan's

testimony, arguing that Dr. Khan admitted that she misunderstood her role as a medical expert at

the hearing and so provided internally inconsistent testimony, which the ALJ properly afforded

little weight.  (Memorandum of Law in Further Support of the Defendant's Cross-Motion on the

Pleadings ("Def.'s Reply") (Doc. No. 17) at 2–3.)  The Commissioner reiterates his prior briefing

to argue that the ALJ properly weighed the opinion evidence and that the RFC determination was

supported by the record as a whole.  (*Id*. at 3–4.)  Finally, the Commissioner argues that the

previous Order from the Court did not establish precedent that an ALJ errs "when no medical

opinion supports the RFC," and Sepulveda's argument is "meritless."  (*Id*. at 4.)

## STANDARD OF REVIEW

A final determination of the Commissioner of Social Security upon an application for SSI benefits is subject to judicial review as provided in 42 U.S.C. § 405(g).  *See* 42 U.S.C. § 1383(c)(3).  A court's review under 42 U.S.C. § 405(g) of a final decision by the Commissioner is limited to determining whether the Commissioner's conclusions were supported by substantial evidence in the record and were based on a correct legal standard.  *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009); *see Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987).  The district court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

"Substantial evidence" connotes "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002).  "In determining whether substantial evidence supports a finding of the Secretary [now, Commissioner], the court must not look at the supporting evidence in isolation, but must view it in light of the other evidence in the record that might detract from such a finding, including any contradictory evidence and evidence from which conflicting inferences may be drawn."  *Rivera v. Sullivan*, 771 F. Supp. 1339, 1351 (S.D.N.Y. 1991).  The "substantial evidence" test applies only to the Commissioner's factual determinations.  Similar deference is not accorded to the Commissioner's legal conclusions or to the agency's compliance with applicable procedures mandated by statute or regulation.  *See Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)

"Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability

creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." *Johnson*, 817 F.2d at 986. However, where application of the correct legal principles to the record could lead only to the same conclusion reached by the Commissioner, there is no need to remand for agency reconsideration. *Zabala v. Ast*rue, 595 F.3d 402, 409 (2d Cir. 2010).

Eligibility for SSI

In order to be eligible for SSI, an individual must be blind, aged or disabled and fall within certain income and resource limits. *See* 42 U.S.C. §§ 1381, 1382(a). An adult individual is "considered to be disabled . . . if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 1382c(a)(3)(A). The physical or mental impairment or impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 1382c(a)(3)(B). The term, "work which exists in the national economy," is defined to mean "work which exists in significant numbers either in the region where such individual lives or in several regions of the country." *Id.*

In deciding whether a claimant is disabled, the Commissioner is required by the Social Security regulations to use the five-step framework set forth in 20 C.F.R. § 416.920(a)(4) and described on page 13, above. "The claimant has the general burden of proving that he or she has a disability within the meaning of the Act, and bears the burden of proving his or her case at steps one through four of the sequential five-step framework." *Burgess v. Astrue*, 537 F.3d 117,

128 (2d Cir. 2008) (internal citations omitted).  Nonetheless, "[b]ecause a hearing on disability

benefits is a nonadversarial proceeding, the ALJ generally has an affirmative obligation to

develop the administrative record."  *Id.*  (quoting *Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir.

1999)).

<u>The Treating Physician Rule</u>

"The SSA recognizes a rule of deference to the medical views of a physician who is

engaged in the primary treatment of a claimant."  *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir.

2015).  Under this "treating physician rule," the "opinion of a claimant's treating physician as to

the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-

supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with the other substantial evidence in [the] case record.'"  *Burgess*, 537 F.3d at 128

(quoting 20 C.F.R. § 404.1527(d)(2)).  "'[M]edically acceptable clinical and laboratory

diagnostic techniques' include consideration of '[a] patient's report of complaints, or history, [a]s

an essential diagnostic tool.'"  *Id.* (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 107 (2d

Cir. 2003)).

A physician does not qualify as a treating physician merely by virtue of having treated

the claimant.  "[T]he opinion of a treating physician is given extra weight because of his unique

position resulting from the '*continuity* of treatment he provides and the doctor/patient

*relationship* he develops.'"  *Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) (quoting

*Monguer v. Heckler*, 722 F.2d 1033, 1039 n. 2 (2d Cir. 1983)) (emphasis added in *Monguer*).  A

physician who only examines a claimant "once or twice" may not develop a physician/patient

relationship and, therefore, may not qualify as a "treating physician" for purposes of the rule.  *Id.*

Conversely, the Second Circuit has recognized that it is possible for a physician to develop a

treating physician relationship over a period of months.  *See, e.g., Snell v. Apfel*, 177 F.3d 128, 130 (2d Cir. 1999) (doctor who saw claimant three times over a six-month period was a treating physician).

"A treating physician's statement that the claimant is disabled cannot itself be determinative."  *Green-Younger*, 335 F.3d at 106.  In addition, "[t]here are … circumstances when it is appropriate for an ALJ not to give controlling weight to a treating physician's opinion."  *Greek*, 802 F.3d at 375.  "[T]he opinion of the treating physician is not afforded controlling weight where … the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citing *Veino*, 312 F.3d at 588).  When a treating physician's opinion is not given controlling weight, however, "SSA regulations require the ALJ to consider several factors in determining how much weight the opinion should receive." *Greek*, 802 F.3d at 375 (citing 20 C.F.R. § 404.1527(c)(2)(i), (2)(ii), (3)–(6)).  Specifically, "to override the opinion of the treating physician, … the ALJ must explicitly consider, *inter alia*: (1) the frequen[c]y, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and, (4) whether the physician is a specialist."  *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (*per curiam*).  "After considering the above factors, the ALJ must 'comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion.'"  *Burgess*, 537 F.3d at 129 (alteration in original) (quoting *Halloran*, 362 F.3d at 33).  The Second Circuit has stated that it will "not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and . . . will continue remanding when . . .

encounter[ing] opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion." *Halloran*, 362 F.3d at 33.

"Genuine conflicts in the medical evidence are for the Commissioner to resolve." *Veino*, 312 F.3d at 588.  However, an ALJ must both "develop the proof" and "carefully weigh it" before deciding which medical expert to credit.  *Donato v. Sec'y of Dep't of Health & Human Servs.*, 721 F.2d 414, 419 (2d Cir. 1983).  "[A]n ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record." *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

Furthermore, while an ALJ is "free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions," *McBrayer v. Sec'y of Health & Human Servs.*, 712 F.2d 795, 799 (2d Cir. 1983), an ALJ, despite having "considerable and constant exposure to medical evidence," remains a layperson.  *Curry v. Apfel*, 209 F.3d 117, 123 (2d Cir. 2000).  As such, an ALJ is not "permitted to substitute his own expertise or view of the medical proof for the treating physician's opinion." *Burgess*, 537 F.3d at 131 (quoting *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000)).  Similarly, an ALJ cannot "set his own expertise against that of a physician who [submitted an opinion to or] testified before him." *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) (quoting *McBrayer*, 712 F.2d at 799) (brackets added in *Balsamo*).

## DISCUSSION

### I.     The ALJ Violated the Treating Physician Rule

First, ALJ Wexler violated the treating physician rule by failing to consider all of the factors set forth in *Selian*, the totality of which favored giving controlling weight to Dr. Parisis's opinion.  Dr. Parisis saw Sepulveda every 2–3 months within the relevant time period and was Sepulveda's primary care provider.  Additionally, Dr. Parisis referred Sepulveda to Dr. Vohra,

22

Dr. Braunstein, and Dr. Lipstein, and all of them provided written updates to Dr. Parisis describing their findings.  In short, Dr. Parisis was intimately familiar with Sepulveda's condition and medical history.  Though Dr. Parisis was not a specialist, she had access to the assessments of several specialists, and the fact that Dr. Parisis was not a specialist is not preclusive of giving controlling weight to her opinion.

Moreover, Dr. Parisis's opinion was supported by extensive medical evidence.  First, there were objective tests: multiple nerve conduction studies showing diffuse sensory motor neuropathy and abnormal results consistent with bilateral carpal tunnel syndrome; blood work indicating rheumatoid arthritis; an X-Ray and an MRI of Sepulveda's lumbar spine showing multiple disc herniations and some degenerative changes.  These objective findings were consistent with Sepulveda's testimony that she suffered tingling, pins and needles, and pain in her arms, and burning sensations and and shooting pains in her legs.  Dr. Lipstein called Sepulveda's carpal tunnel "quite symptomatic" and also found that Sepulveda did have tenderness and body aches, albeit not enough to trigger a diagnosis of fibromyalgia.  In addition, the examinations of Dr. Braunstein revealed movement restrictions in the neck, decreased sensation in the hands, and decreased sensation in the lower legs, which are all consistent with Sepulveda's reported pain.

ALJ Wexler not only failed to expressly consider all of the *Selian* factors, but also failed to provide "good reasons" for giving Dr. Parisis's opinion little weight.  The ALJ stated that "the majority of [Dr. Parisis's] care centered over the claimant's diabetes and not her orthopedic/neurological complaints," a distinction with unclear meaning considering that Dr. Parisis was Sepulveda's primary care provider and treated Sepulveda for, among other things, diabetic polyneuropathy.  Tr. 46.  It is true that Dr. Parisis indicated that Sepulveda would need

23

to keep her legs raised during prolonged sitting and standing, which Sepulveda did not discuss in her testimony. Tr. 232. However, Sepulveda's testimony that she did a load of laundry "here and there" and was able to shop for small amounts of groceries and unload the dishwasher, Tr. 390–93, was not inconsistent with Dr. Parisis's opinion that Sepulveda could sit and stand for only ten minutes at a time and could sit, stand, or walk for a total of less than two hours in an eight-hour workday, Tr. 231–32. During the relevant period, Sepulveda was living with her father and testified that her sister would drop off groceries or other items for her. Tr. 390–93. She reported that she only drove locally, got her daughter breakfast and made "light meals type of thing at the most," did a small load of laundry "here and there," and used a computer to access social media "here or there," none of which is inconsistent with Dr. Parisis's assessment that Sepulveda could grasp, turn, twist objects, engage in fine manipulation, and reach for 5% of the day. Tr. 390–93.

Finally, the ALJ's finding that Dr. Parisis's expectation that Sepulveda's pain would frequently interfere with her attention and concentration, Tr. 232, is disproved by her performance on Dr. Braunstein's "mini-mental function tests" finding that Sepulveda was alert, awake, and fully oriented, *see, e.g.,* Tr. 206, 208, 308, ignores other parts of Sepulveda's testimony. She stated that she stopped work in 2011 because "your concentration when you're in pain, you couldn't perform the job the way you needed to. It was very stressful." Tr. 385. Sepulveda also stated that sitting was painful for her, and that her pain inhibited her concentration at work because it was "physically too much." Tr. 397. If anything, this testimony is supported by Dr. Braunstein's records, which show that Sepulveda returned to her office three times in four months due to complaints of pain in her hands, feet, and throughout her body.

## II.     The ALJ Substituted her Medical Opinion for the Doctors'

Even if the ALJ had not violated the treating physician rule, the Court would remand this matter because the ALJ's RFC determination was wholly unsupported by any of the doctors. RFC is "a medical assessment, and therefore, the ALJ is precluded from making [her] assessment without some expert medical testimony or other medical evidence to support [her] decision." *Zorilla v. Chater*, 915 F. Supp. 662, 667 (S.D.N.Y. 1996).  In this case, the ALJ's determination that Sepulveda was capable of sedentary work was not supported by Dr. Khan's internally inconsistent testimony or by Dr. Parisis's opinion evidence.

"Before an ALJ classifies a claimant's RFC based on exertional levels of work (i.e., whether the claimant can perform sedentary, light, medium, heavy, or very heavy work), he 'must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis ….'"  *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013) (quoting Social Security Ruling 96–8p, 1996 WL 374184, at *1 (July 2, 1996)).  In classifying the physical exertion requirements of jobs as sedentary, light, medium, heavy, and very heavy, the SSA uses the definitions of those terms as set forth in the DOT.  See 20 C.F.R. § 404.1567.  Those definitions are quite specific.  For example, sedentary work requires the ability to sit for a total of "approximately 6 hours of an 8–hour workday." *Michaels v. Colvin*, 621 F. App'x 35, 40 (2d Cir. 2015) (summary order) (citing SSR 83–10, 1983 WL 31251, at *5).

Here, the ALJ gave little weight to the medical opinion evidence of both Dr. Parisis and Dr. Khan, and found that Dr. Branstein had not "furnished restrictions preclusive of sedentary work nor can any such restrictions reasonably be discerned." Tr. 47.  However, Dr. Braunstein did not submit any opinion evidence at all, and guessing at what Dr. Braunstein's medical

25

opinion might be based on the record is tantamount to substituting one's lay opinion for that of the doctor.  Accordingly, the Administrative Transcript did not contain substantial evidence to support the ALJ's determination that Sepulveda was capable of sedentary work.

## CONCLUSION

For the reasons set forth above, the Commissioner's motion for judgment on the pleadings is denied and Sepulveda's motion for judgment on the pleadings is granted to the extent it seeks remand.  This matter is remanded to the Commissioner of Social Security for further proceedings consistent with this Memorandum and Order.  The Clerk of Court is respectfully directed to enter judgment in accordance with this Memorandum and Order and to close this case.

SO ORDERED.

Dated: Brooklyn, New York
      March 31, 2021

*Roslynn R. Mauskopf*
_____
ROSLYNN R. MAUSKOPF
United States District Judge